We've gathered for a special hearing here this morning. ASTRAZENECA v. BREATH LTD. Mr. Seitz. Thank you, Your Honor. May it please the Court, my name is Christopher Seitz. I'm here on behalf of the plaintiff's appellate, ASTRAZENECA, and I'd like to reserve five minutes for rebuttal at the court's decision. There are two patent issues. There's the 834 patent to sterile powders formulations and methods of producing the same in the 603, to methods of treating respiratory diseases. With the Court's permission, I'd like to start with the 834 patent. I would actually, I don't know if my colleagues feel the same way, but I would be more interested in hearing from you on the 603, and since time sometimes catches up with us, if you don't mind and that doesn't disrupt your argument unduly, that would be helpful to me. While you're flipping pages, let me make sure I understand. What is the practical consequence if we should, for example, sustain the district court on the 603, but reverse the claim construction on the 834? We think it's clear, Your Honor, that the lower court's finding of non-infringement under the 834 cannot stand if our claim construction is reversed, and as we believe, the claim is restored to being a product claim. The claim is finally devised as a powder for the meaning of micronized powder composition. And in that case, it should be sent back to the district court. We don't think, although I suspect that others may disagree, but that there be even a dispute over infringement with the proper construction, but at minimum, there would need to be a new finding on infringement, and I believe they've asserted validity challenges that would need to be considered. There are pending validity challenges under the 834? That is my understanding. All right, and I take it that... Well, actually, you can tell me this. It's just a couple of questions, right, and I won't interrupt. The two claims that are asserted under the 834, 1 and 50, could we switch back to the 834 now? I just had a question on the 834, and I want to make sure that I've got this, since that case may have to go back. It does. 1 and 50. 1 and 50 are the two independent claims. Right. 50 is the one that deals with the sterile suspension and 1 with the sterile powder. That's correct, Your Honor. So it's really... Is your theory that 50 is the one that's infringed, not 1? In terms of literal infringement, for at least two of the three, the literal infringement would occur under Claim 50. Claim 50 is not the central claim. Okay, go ahead. And, Your Honor, you're exactly right. Claim 50 makes it clear that the criteria of sterility, the requirement of sterility, applies to the aqueous suspension, not to the powder directly, which is why non-infringement based on the idea that it has to be dry and sterile at the same time does not apply to Claim 50. So let me turn, Your Honor, if you prefer, to the 603 patent. The errors here, it's quite an extensive opinion, but I think the error that is fundamental here is that the court relied heavily on the expert testimony, a defendant's expert, not to understand the teachings of the prior, but to fill in some pretty clear gaps in that and that she was unduly influenced. And we think that's kind of a legal error. You're not entitled to... It's an error to read the prior art, supplementing it with expert testimony, rather than using the expert testimony to understand the prior art. That was most evident, we believe, in the anticipation holding, but equally evident in the offices holding, particularly with regard to the dependent claims to children, for example, Claim 16, which is children six months to five years. The defendants put on the testimony of Dr. Barnes, who is the author of the article that the district court found anticipated. I think there's always a risk when the author of an article is testifying because it can be hard to distinguish between what the article says and what the author is saying. In some sense, from hindsight, what he wishes he had said. I think that's clear from Barnes, where there's only one sentence in each of the sections that the court, really, that was key. There's a section on studies in children on page 19-150 that refers to using nebulized budecin on children. On the next page, there's a single sentence in a different section, frequency of administration, that said, for patients with mild asthma, one dose per day may suffice. Nothing connected to these two statements. Nothing in the article. Anything on once daily? The once per day is on page 19-151. It's at the last sentence of the section, frequency of administration. All it says is, for patients with mild asthma, one dose per day may suffice. There's not even a reference to budecinite. They get to budecinite by following footnote 49, which refers to the Jones article about turbohaler once daily. That's not children, and it's not a nebulizer. So when you're talking about nebulized budecinite, you don't talk about once daily? Correct. The only reference for that statement about one dose per day is referring to a different device, the turbohaler, not nebulizer. And they're very different devices with very different methods. So what about obviousness? So let me come to obviousness, and I'll just point out because this will hit obviousness too. In between those two statements is a section on the pharmacokinetics of the drug. And in there it discusses both how the device can change the disposition of the drug and other factors, such as the age of the patient that may alter the disposition of the inhaled dose. So in between those two sections is a discussion about how the device can affect things and the age of the patient expressly, the age of the patient. So somebody reading the whole article isn't going to connect the two statements and is going to see that the age of the patient matters. And that takes us to obviousness because the same error applies there. If you look at the court's opinion on obviousness, and again I want to focus on the dependent claims because I think there it's most glaring. The court relied heavily, again, on expert testimony to make all of the leaps to children. The prior article does not teach one's daily administration in young children. Again, it focuses on six months to five years. And it doesn't teach you anywhere nebulized predestinated applied once daily. To get there, and particularly to get there in young children, she relied on testimony saying that a person with a skill in the art would believe that nebulizer and other devices are interchangeable. But it's very clear that children are going to have trouble with PMDIs or DPIs. Doesn't that suggest nebulizing? Certainly the reason nebulizer is used is because the other devices are hard, but I think that shows that the prior teaches the other way. Because despite that fact, there were no studies with once daily with a nebulizer. And the studies that they point to in children for once daily, one, they're older children, but two, they're using the other device. But we had these once daily studies that were showing itself safe and effective, right? It shows that they are safe and effective in other devices with older children and adults. There's no... We don't believe that prior art teaches once daily in the young children six months to five years and nothing... Well, we're in obviousness. It doesn't have to teach it. It doesn't, but there has to... There has to be a logical progression that makes it reasonably expectable that there'd be success with this. And we've just seen kind of a progression where children can't use alternative methods. It's safe and effective to use a nebulizer. Where am I missing the logical progression here? The challenge is what the prior art expressedly is saying is the age of the patient matters. The device matters in terms of how it's disposed in the lungs. Nobody understood at the time why we must not work once daily, even in adults, even with the other device. Did you give us any objective... Excuse me a second. Go ahead. I was just going to ask about objective criteria. Maybe you can show us some objective evidence that would lead away from this logical progression. Yes, Your Honor. And we do think there is objective evidence that the court didn't give due weight to. One is, it was undisputed in this case that once daily treatment with a nebulizer is desirable, and especially desirable in young children because young children don't like taking medication at all. A nebulizer, unlike these other drugs, is prolonged. It's a very different way of administering a drug. So there was a great desire for once daily. And the court noted that in her obviousness. But then in weighing, for example, commercial success and skepticism, she dismissed the idea that once daily might be what she called a sales driver. So she dismissed the commercial success... But your skepticism was your own senior management. Isn't that discountable to some significant extent? I don't believe so in this context, Your Honor, where the skepticism is objective. Where they did an extra clinical trial because there were great concerns that once daily with a nebulizer was not effective. This is not a matter of somebody simply creating a document to try to support skepticism. This is running an entirely additional clinical trial. And I think the court is aware that's an expensive and difficult undertaking. It's particularly difficult here where the patients for six months to eight years recruiting young children is hard in clinical trials. So this is truly objective evidence of skepticism. It's not somehow manufactured evidence. Mr. Weiss, I have said if we were to affirm the district court's ruling on obviousness with respect to the method claims that were held obvious, is there any argument on validity that would remain that would apply to the method claims that the district court declined to rule on that's method claims six, 11, 18, and 21 to 23? Is there any reason that would sustain the validity of those claims over the validity of the other claims since they all appear to be broader? I'm not aware, for example, with regard to claim six as to whether or not some of those diseases might be different. So I can't, and I apologize, I can't say that I've thought about whether or not some of the dependent claims that we've not discussed in the brief might survive. Well, each of them, in your opponent's brief, they chart out each of the claims that the district court decided not to address and said that each of them is actually broader than another claim which was invalidated. For example, in the case of six, I think six is, and I think if you look at six and seven, six is clearly broader than seven. Seven is just the method of claim six wherein the respiratory disease is asked. Seven was invalidated, therefore six presumably has to go, wouldn't you agree? Right, I guess, I believe that if all of the invalid claims are held, the claristical effect of the judgment will likely preclude enforcement of the patent in the future. And if that's true, why not simply have a single judgment here rather than requiring these claims to hang out there until somebody has the fortitude to attack them? As a practical matter, it's not clear to me that it will change that much, but it is worth pointing out for two reasons, really. One, that the court did have the proper discretion not to reach those claims introduced inside the D.J. action, particularly in the context where its practical relevance at the time was unclear. And in addition, in essence, then what the defense are asking to do is to leapfrog over that collateral estoppel analysis. Well, my question was not with respect to collateral estoppel. I'm assuming that the district court had exercised discretion and had gone forward and ruled on the validity of those claims. Is there any patentable distinction that would have been asserted to distinguish those claims from the other claims that were held in balance? I'm not aware that there was, Your Honor. It seems to me for the reasons pointed out by Judge Bryson that if they're broader than the claims, the other claims that were invalidated, they were of necessity. They were dead on arrival. That's likely the case, Your Honor. As a matter of policy, we have to be efficient, don't we? I mean, if you're going to ask us to rule on every claim, we simply, in the judiciary, don't have the resources for that. That's correct, Your Honor. I think that's why the district court recognized that it wasn't necessary to reach that discretion down to the guillotine. As a practical matter, it wasn't worth the resources to get that. Let me just come back to the 834, just to make sure that in case there are any questions I want to address. The key point here is that the words of the claim are clear. Micronized powder composition. And that implies nothing about sterility. Micronized, as the parties agree, means finely divided. And the patent at column 1, 65 to 67, describes micronized as finely divided. The court at A108 agreed that everyone agreed that's what micronized means. So we're using words that are clearly directed to the product, not to the process of making it.  is clearly the intrinsic evidence shows the inventors believed correctly. That they had invented not just a process for making a sterile pharmaceutically acceptable formulation of budesonide, but that product itself, the sterile pharmaceutically acceptable budesonide formulation, it hadn't been achieved before. Remarkably, before this invention, over a year, those budesonide inhaled formulations have been sold non-sterile because of this challenge. Let me ask you, let me ask you, because I think your opposing counsel is likely to call our attention to the use of the term the word invention, the invention in the specification, which is used several times in the specification and they invoke the line of our cases that when you talk about the invention, you're limiting yourself to whatever you then describe as being the invention. Could you address that? I can. I think it's an important point and I want to distinguish the language used in the patent here, the 834, from language called the present invention is. That's boilerplate that you'll see in a lot of patents. There's some question of whether or not that is limiting, but clearly it's purport is very clear to define the present invention. Here is different. Here, the patent often says according to invention, there is provided. And there's a number of instances in which it's provided, sometimes a new process, sometimes a new product. And it was clear in reading this that the inventors believed that they had made more than one invention because it had been unachievable to make a pharmaceutically acceptable sterile butadiene formulation before. They had to make a process invention to achieve the product invention. And they claimed both. And they were careful to claim both. So in the field of the invention in column one, the invention relates to one is a process, but next comes sterile formulations containing glucocorticosteroids in use thereof. And then again, there's a description of according to the invention, there's provided a process. But beginning on column five, a new discussion begins. The invention further provides a sterile glucocorticosteroid, preferably, and it goes on, preferably budesonide, without regard to how it's made. And then again, column five, at line 13, according to the invention, there is further provided a sterile pharmaceutical formulation comprising a glucocorticosteroid and an aqueous suspension. So they were very clear. They believed they invented not just a process for making the product, but a whole new product. And the intrinsic evidence repeats that over and over again, that they put in statements. Applicants have also discovered pharmaceutically acceptable suspension, including sterilized particles, including budesonide. That's at page 1252 in 2003 objection. And then in 2007, regardless of how desirable a sterilized budesonide composition might have been, no one except applicants know how to produce it at the present application priority date. They have come up not just with a new process, but a whole new product. They used words to make clear what they were claiming was a product. And they were very careful, I think, both in the specification and the intrinsic evidence, to argue for their process claims or their claims that were limited to a particular kind of process with those arguments and the claims that were directed to the product on the basis that the prior art didn't produce a product whose characteristics, whose product characteristics, specifically that it be among other things pharmaceutically acceptable, did not fall within the claims that they had come up with a new product. And indeed, the person who is going to be reading this, first of all, there's a heavy presumption of this word here. But reading the whole patent and all the intrinsic evidence of the process history makes those two views clear that they've not just invented a process, but a product and that the claims that issued here was the inventor's effort to use plain words to claim the product itself. Mr. Seif, Judge Bryson started us out with a discussion of what happens if we sustain the district court on 603 but reverse on 834. What does that do to the injunction?  I believe that the injunction remained in place long enough at least for us to go back to the district court and seek an injunction from the district court with regard to the 834. I believe that the factors in favor of preliminary injunction, the likelihood of success of the merits, will continue to apply and support an injunction down there. But presumably, we would go back to the district court with the status quo preserved to seek a preliminary injunction from the district court. All right. Thank you. We are going to restore Mr. Seif's rebuttal time. Therefore, I need to give the other side nine minutes. Reggie, I'm not sure how we're going to divide it. There are additional  between the two counsels. Just give it all to Mr. Mercosi. Yes, sir. Let's give it all to him and you can sit down a little early if you want to share some with your colleague then. Thank you, Your Honor. William Mercosi, for the Watson and Brett defendant. I'll be presenting for the defendant unless the court has any specific question as to aptex or standards of their counsel, obviously, here. I'll start with the 834. We believe the construction was correct and required by the intrinsic evidence. I believe Judge Bryson, your comment on the invention is key here because they're not entitled to claim more than they invented. The record here is crystal clear. They were never able to get any other process to work. Filter sterilization was not possible. Steam heat was not possible. They then recounted that in their specification in comments 1 and 2 and it wasn't just saying there are a few slight problems with the prior processes. It doesn't say the specification clearly separates the process from the product. Actually, we would... I'm sorry, Your Honor. The specification disparages sterilization from all other methods except the low heat. That's correct. And we would... I'm sorry. Go ahead. We would say that it not just disparages but in the words of AstraZone expert it rules out those other methods and it does connect the product to the process. Well, I take it... Let's see if I... I'm mistaken in my understanding of the lay of the land here. There's nothing wrong, I take it, with saying, okay, I came up with a process that resulted in a product. The product is new. So is the process and I claim the product. I claim the method and I claim product by process. You can put all that in... Assuming the examiner doesn't impose a restriction requirement, you put all those in a single patent. There's nothing wrong with that, right? There's nothing wrong with that in a vacuum. Right, okay. Well, I'm starting with the vacuum. Okay. And that... The product protection is for that product without... Assuming the vacuum, without regard to how it is produced, right? If I have a right to the... If I invented the product in the first one there, I get protection on the product regardless of how it's produced, correct? We are not arguing that a composition of matter could be patentable in and of itself. Right. Again, in a vacuum without regard to this intrinsic record. So doesn't your argument really come down to saying that in the specification in particular, the references to the invention suggest that there's only a single invention, notwithstanding the fact that the claims, different groups of claims, seem to fall into each of those three categories? We would say, Your Honor, that the disclaimer is clear in the specification in and of itself and then reconfirmed repeatedly again in the file history because the product, if you look in column four, when this sterilized glucocorticosteroid product first appears, it then gives you the properties of it and then we get the statements about that product will maintain the same physical and chemical form. Then it reconnects it to the process saying, i.e., the degradation will be limited by the presence of the information process. But following up on what Judge Bryson is inquiring about, isn't it kind of axiomatically wrong to read a process into a product claim? As a general proposition, Your Honor, again, without regard to the intrinsic record here, general process limitations are not read in, but that's the tip of the iceberg in this analysis because even when the claim language may not seem to have the words heat sterilized in it, and we're not arguing it does, the court still needs to look at the intrinsic evidence, the specification and the file history to see if there were disclaimers, to see if the inventors said it means something different or if they surrendered coverage. In here, they didn't just invent a product out of the ether. They told the skilled person none of these other processes will work. They disparaged them and there's no dispute. All the experts in the intrinsic record say only the dry heat process will reduce the product. Deal with the claim differentiation where the independent claims specifically mention the heat sterilization giving us a pretty strong clue that the independent doesn't have that limitation. And the court need not be concerned with claim differentiation for a couple of different reasons. Number one, that doctor just presumes claims are a different scope and here, claims 38 and 42, they don't depend from these surrogate claims and they are a different scope. They have different limitations including being produced by sterilizing with viable microorganisms containing particles. It's an admitted limitation not found in any deserted claims. But even if it wasn't, even if it wasn't your honor, claim differentiation cannot override disclaimer. The claims cannot be broadened beyond the specification in the final history. And here we believe again a clear and unmistakable disclaimer. They said none of these processes work. They're all unsuitable. We found a new process and the product obtained thereby. They call that product repeatedly the invention. And this isn't a case of where there's just an embodiment or one of several. The only embodiment admittedly is the low dry heat sterilized product. We have many cases that make it clear that just because you have one embodiment that your invention is not limited to that embodiment. But you know, you refer to the invention if you look at column one, the paragraph from lines 16 to 20 talks about this invention relates to a process, et cetera, sterile formulations and use thereof. So the invention is described as three different things. Is that right? That sentence says that, Your Honor, but nowhere in the specification does it ever divorce that product from the low dry heat sterilized process. Well, in column five the discussion of the sterile pharmaceutical formulation is not described as being as how it's made. There's no discussion in that column of how it's made. No, Your Honor, but the sterile glucocorticoid steroid is first introduced in column four and there it connects it to the sterile glucocorticoid steroid of that sterilization process, the low dry heat process. Well, where is the disclaimer that says that that's the only process? Well, Your Honor, it is the only process disclosed in this specification. The record is undisputed actually, not just in the spec, but the experts that no other process will work to get this dry heat sterilized product and we must remember here, even after it doesn't dispute, we're talking about a   process. Now, in the documentation of the file history, did any inventor ever say we invented B. Decini  other process because they couldn't have. They admitted the only thing they invented was the low dry heat. And in the file history, Your Honor, it even is more explicit. In the sections where they say applicant invention, they actually say it's the powder or the product that's been heat sterilized. Then, when their claims were all rejected repeatedly by the patent office, and again, these were claims that both had heat sterilized in them and claims like 65 that never did, they were all rejected by  office. When they were discussing on the case, they said that the products are different. They said that a filter sterilized product is different from a heat sterilized product. They said that a steam sterilized product is different from a heat sterilized product. So they're telling the skilled person repeatedly that our product is only the low dry heat product and that it is different from all those processes or products of those processes that they disparaged and disclaimed in the specification and the file history. We would say this case is very similar to cases like Chime or cases like Anderson where yes, the court looked at the case and  yes,    in which the  at it and said, yes, this case is very similar to that case. They're telling the skilled person repeatedly that our product is different from all those processes or products of those processes that they discriminated against. Why? Micronized budesonide used in the example Your Honor, when obviously they start with nonsterile and then they apply the so-called invented low dry sterilization process to it to make it a sterilized budesonide. Obviously the examples, they can't start with sterilized budesenide because that's their invented process. So yes, they started with nonsterile and then they went and what ASTR is basically asking for here is a budesonide product that is FDA approved and sterilized. This patent covers everything. And that's not what they invented. They did not invent budesonide sterilized by any means whatsoever. They told the skilled person over and over nothing else known in the prior art would work. Matter of fact, they didn't just disparage it, Your Honor, they did disparage it but they went beyond that. So the disclaimers here are disparaging, saying it just won't work, ruling out every other product in prior art process, and then saying the invention, our invention is only the heat sterilized product or process. Then going beyond that in distinguishing all the prior art rejection solely based on the process. Relying solely based on the sterilization, the low dry heat to distinguish from the prior art. And again, our fourth point is, again, saying the products. Talking in AstraZeneca's language and argument here, they said that the prior art products are different from a heat sterilized product. Again, filter sterilized is different. But that could well be and not be inconsistent with the idea that all they're claiming is a product. Their point, I take it, is that all of these prior art methods of sterilization had negative impacts on the efficacy of, or the integrity of the molecule and the efficacy of the drug. So that's why our process is good and separately, why we've invented a product that no one has previously been able to invent. But that's not inconsistent with saying that the process is one thing and the product is one entirely different thing that doesn't depend on the process. Right? I mean, it doesn't depend in the sense that you don't have to include that as part of the claim limitation. But we would submit it is, Your Honor, when you tell a skilled person that nothing else will work. None of these other processes will work to make this product. But if I were in this field of the art, and you were much ahead of me, I'm sure, but wouldn't I anticipate that there's going to be advances in other ways of sterilization over the life of this patent? There may come a time in the future where filter processes may be perfected  get to the same product I've got. Therefore, I don't claim anything other than the product, recognizing that that will give me coverage into the future, even if these methods that don't work now are proven to work in the future. Wouldn't I claim it just this way, and wouldn't I have coverage of my product despite those other advances in process? Well, Your Honor, but the problem is that's not our record here, is that they actually said filter sterilization was impossible for predestined drug products and drug companies. While they must have covered a product made by filterization somewhere down the line, we submitted simply not credible and devised logic to suggest that the skilled person reading the totality of this evidence, intrinsic evidence, the spec, and the bio-history, again, where they recount the failures and how this simply will not work. The skilled person could not possibly come to the conclusion that this is a filter sterilized predestined product, or steam heat for that matter, or irradiated. You're saying there were no advances made in any of these other processes over the years since this has been filed? Your Honor, I can't speak to whether there's been advances in all those prior processes. I can't tell you that as of 1997, the critical date, the record evidence here, both in the specification as well as the inventor and the after testimony, was none of this would work. They failed to do it. They admitted they did not invent a filter sterilized or steam sterilized product. They only invented the low-high. That came later, but they claimed it as a product, which covered those advances in technology and other  Why not that read? We would disagree with that, Your Honor, because even if it was pure product language, you still have to look at the disclaimers when they say ... They're disclaiming ... I'm tying ... What my question is doing is tying those disclaimers to 1997. Exactly. But the claim is not tied to 1997 and covers a product however made and however used into the future. And I'm saying your argument discounts that aspect of our law. To the extent it's being discounted, Your Honor, it's only because the skilled person, the public notice function, the skilled person sees kind of advance in time with the art and is going to recognize, oh, this didn't work in 97. It works today. We can now filterize this,  it still covers the product claim. That would be a new invention, Your Honor. The process would be a new ... You'd have a new process. But the skilled person, Your Honor, is entitled to rely on the state of this record as of 1997 to interpret these claims as to what they include and don't include. And they would see in 1997 that they don't include. They would see it's a product claim and they would say that covers this product however made  however used. Your Honor, we would respectfully disagree that you will never find any statements or even hints to that effect in the spec or the file history that it covers a product however made. No, that's the law. That's kind of patent law. I teach this in my 101 class. It's the second class. I have a very colorful example I use, but I won't impose that on you. That plain language concept, Your Honor, is always subject  there's a clear and unmistakable disclaimer in the spec and file history. This goes back to my question earlier about where is the disclaimer. I'm having, I think, the same problem the Chief Judge is having. That, you know, you have separate inventions set forth here, the product being a separate invention from the process, even though the specification disparages a lot of the other processes and asserts that the process described here as invention is new, different, patentable. That doesn't necessarily impose a limitation on the product. It does, Your Honor, when they told the skilled person that you can't make it any other way. But I don't find that language here. Actually, Your Honor, in the specification they say not just, they don't just disparage. I don't find anything that says you can't make it any other way. The other previous methods of attempted sterilization don't work, but that's not to say that this is the only one that ever could be made to work. It's the only one they ever disclosed and enabled, and in the file history they repeated that. Right, but that sounds like you're coming back to questioning my initial vacuum case. You don't have to disclose multiple methods of producing a product in order to claim the product however made. We agreed on that. We agreed on that, Your Honor, but when you say the invention and you disclose one invention. If they had said one of the inventions instead of the invention, would you say game over? If they said one of the inventions? Right. If they said one of the inventions is any budesonide product that's pharmaceutically acceptable, that might be different, but they didn't. They said it's a sterilized budesonide product by this means and even when they introduced the sterile glucocorticoid steroid of the invention, they connected back to made by the present sterilization process. That's the whole point here. And the district court looked at this disclaimer and saw every time they were talking about a sterilized budesonide product, it was always connected back to the sterilization process of the invention, which we know is solely the low concentration of   the reason why they didn't  sterilized. They said it's a sterilized product. And even if you did, they wouldn't work. And even if you get them to work at all, you would get a completely different product from a heat sterilized product. There would be no need to do that if this was any budesonide product. In the rule 131 declaration, when they were talking about claims that did not have heat sterilized words expressly in them, they were talking about what the invention recited in those claims and they talked about the low dry heat sterilized budesonide product. If this was any budesonide product, because it arose for the first time, why in the world would that declaration describe the invention as low dry heat sterilized product and only give data in there about how it's made. In the Eklund declaration, when she is describing what they invented, she said the FDA told them go find a way to make sterilized budesonide, they tried and failed every single way until they got to what she described as their only invention, the low dry heat sterilized process and the budesonide obtained thereby. We suspect that the skilled person reading the totality of this is never going to come away with this is just any budesonide product, it is a very specific sterilized product by a very specific sterilized method. And I see about one minute left. Any words on 603? Very quickly, Judge Rader, on 603 it seems now we have  the ability to use the nebulized precisely because of your honor's prior comment that young children have more of a problem or difficulty coordinating the DPI and the MDI so you want to use the nebulized and the art such as Jackson and McCarthy actually talk about the fact that for young infants with very severe asthma, the nebulized therapy is a very significant important therapy precisely because you give them something they can use and something that improves patient compliance and convenience and then using the step down approach leads to less side effects. Well I guess that Astra's own advertisements in Europe in 1994 referred to nebulizing in children down to three months, right? The only thing missing there is three months wasn't it? Three months old, yes. So the only thing missing there I guess would be the once daily. You had this issue come up on the preliminary judgment. It depends on how the court finds on inducement. Our view is if you find inducement then that ad in fact is a non-nebulizer right? That was a non-nebulizer right? That was a non-nebulizer form but the art taught     device in the end was not important. By the way did the district court find that the delivery device in the end was not important? No. The district court found that the delivery device in  not important. Did the district court end was not important. Did was not important. Did the district court find that the delivery device in the end was  important? district court find that  delivery device in the  court found that delivery device in to the distinction exercised by      that we're undertaking to shed light upon this issue. So in fact, the fines they are not   as the other fines. And I think Mr. Okozie made a point that they never said they were just claiming the product. That's not true. They said it a number of times. For example, at A1448 the statement was dealing with a claim addressing sterilized powder. Applicants were the first to discover a practical way to produce a pharmaceutical acceptable sterilized powder composition at least 98.5 percent by weight. As such applicants are entitled to claim the composition. That's at A1448. They were very clear in the specification in the claims and in the prosecution history that they thought they were entitled to more than process claims. That they were entitled to product claims. And they used language very specific to do that. Would you comment please on Mr. Passil's argument with respect to the O'Neill reference in the prosecution history? That was at page 1181 of the appendix,  I think that those claims are dealing with claims. This is claims 10 and 11 that were rejected. So claims 11 and 11 were rejected. Claims 11 and 81 are dealing with claims I believe about, let me just make sure, that are dealing with I think they were dealing with at that point with a sterile powder. So they were distinguished that way. They did introduce later on I believe claims relating to the substance modification that came later. I'm aware your honor that claim 94 which was introduced at page 1704 with the introduction of the claim a sterile pharmaceutical susceptible suspension consisting of a micronized powder composition. So that's what it became, claim 50. With a substance modification to define the criterion at the end. And the discussion there is talking about the new formulation and that's what connects it to 1713 to regards to how desirable the composition might have been. No one except applicants knew how to produce it at the present applicants priority date. I think they were quite clear that they recognized that they had developed not just a new process but a new product. And the product is not just the but also a sterile formulation. Thank you Mr. Sykes. Anything further? Just to respond quickly to the bond issue. Given the size of the retroactivity you're seeking it is as you would imagine a significant issue. It's somewhere that the only case I'm able to find for a retroactive increase in the third circuit is a case involving fraud which has certainly not been alleged here. It would be an unfair accusation. District court right? District of New Jersey? That's correct. The case itself said no retroactive increase. The issue is different. It's whether going forward you can include the past damages. We think that violates the rule against retroactivity and that's clearly forbidden under third circuit law. The bond establishes the viability for the injunction. With regard to the desire for which I'm not sure it was expressed in the argument to even increase the bond prospectively to include the past damages. The injunction should not become increasingly expensive in the future because of an attempt to recapture all damages that undermine the rule against retroactivity. The reason we're in this vote is architects waiting. The bond up to 2009 in December, they waited until August 2012 to ask for an increase. The cost of their delay retroactively onto us. The rule in SPRINT doesn't permit that. I guess we did reach the bond. That gives you a minute. In response to that argument, there are three cases that stand for the proposition that the case can be remanded to increase the bond amount after an injunction has been dissolved. They distinguished it because they said the bond still existed which might be an outcome that would occur in this case. But American Bible, which is a third circuit case, allows an increase in the bond after the injunction has been terminated. This court, actually, in international game technology, considered the issue and remanded the case after the injunction to consider the possibility of increasing the bond amount. And in one of the cases, that's international game technology versus WS gaming 217 F 3rd 850. And a case that AstraZeneca themselves cited, Service Corp versus Guzetta, it's a Delaware chancellery case, but that case that they cited actually also stood for that proposition that it's not proper to go back. And, again, Sprint and ScanVac, they also talk about the fact that it's usually the case, it's generally the case, you're not allowed to go get a bond retroactively increased, only in that case you're not allowed to go get a        that they cited, and that's a case that they cited, and that's a case that they cited, and that  a case that they       they cited. So, again, that's a case that they cited, and that's a case that they cited. Thank you. Thank you. Thank you, counsel on both sides for an excellent morning. All rise.